And home health, for Medicare purposes, you just don't walk in and get a certificate of need or the right to provide services. It's very highly regulated. In order to be approved to provide Medicare services, you must show the federal program by way of the state hired surveyors that you indeed can provide quality services. You're extending employees and providing different types of services for the two different firms? What did you mean by that? I thought they were pretty interchangeable out there. They're not necessarily, Your Honor. Again, it's easy to say a nurse is a nurse is a nurse and a nursing case is a nursing case. That is completely different when you're talking about the type of nursing skills that are necessary for A-One services to the medically fragile child, including ventilator services, I.V. therapy services, those kinds of things, versus a Medicare certified agency who provides services to an aged group of people, which may involve some of the more intensive services. But the private duty services is oriented to be not Medicare certified services. They are a repeat. They are tended to be a temporary type of services, and so they are different. In addition, alternative rehab provided physical therapy, occupational therapy, and those kinds of services that the A-One medical services did not provide or could not provide by way of their operation. If I may pose a question, it seems to me that they had some services that were of a different nature, and they had somewhat different organizations, you know, different pay periods, different formalities. But they did, at least in certain cases, transfer patients from one entity to another. And when they did that, to keep continuity or for whatever reason, as I understand it, the employees would move to work for the other company. They'd follow the patient, and maybe they'd do that back and forth, or they'd end up working for both companies. So what percentage of the work done by, let's say, by A-One, I guess it would be by alternative, involved workers who were transferred over from A-One or vice versa? In other words, what was the percentage of the total work, if that's in the record of each of these companies, that involved people that overlapped that worked for both companies? Your Honor, I don't think there's a clear number that I can define as a percentage in the record. There is evidence of two or three patients that were transferred from A-One's census, as they call it, to alternative rehab for the purposes of that alternative rehab would have sufficient patients for a Medicare service. OK, so I understand in that case, if if A-One transferred someone, a patient to alternative, and to keep the patient happy, they tried to transfer the same person temporarily or partially. So there'd be patient continuity. I can understand that. And that, to me, doesn't bring them together so much as an enterprise. But if there are other people who aren't in that situation, who are just working for both companies, and if the manager or the black managing both of them is moving employees from one job to another, you know, to meet needs of one staff is too busy, the other isn't. There's that kind of general movement that seems to me is very strongly persuasive of the single enterprise. Your Honor. What is the evidence? I'm not sure how much evidence is in the record on the points of interest to me. And then I want to know, is it in the record? And if not, whose burden is it on this issue? The burden on this issue to prove that there wasn't joint employment clearly falls on the secretary, Your Honor. And in that case, there is not sufficient proof there to say that there were allegations from the punitive employees, who, again, on the issue of summary judgment, you know, against us as a non-moving party in that context, should not have been given that great a weight. There were circumstances, and again, this goes back to the idiosyncrasies of the home health business, in which if there was a potential for a private duty independent nursing care, or primarily that falls in the area of the companion type where you needed a sitter to stay with a patient who was an aged patient in the Medicare certified operation, there was a potential there that they would contact after, you know, after there was enrollment in the Medicare program. A1 Medical would then say, okay, this patient also needs private duty. We've been called for a private duty because these people cannot operate just simply out in the blue and decide services. Medicare services have to be specifically authorized by a doctor. And so they would ask that employee who was providing the personal care if they wanted to do the sitting care. Again, at all times, it was a choice of the employee to take that case or not take that case. This person, we're here on summary judgment. And the question obviously arises, is there a disputed question of fact that you can point to? Because the judge obviously made legal conclusions, and there didn't seem to be any articulation of distinctions, which would require fact-finding either before a judge in a separate proceeding or in a jury. Your Honor, if you're referencing a disputed issue of fact on the joint employment and or enterprise finding, because the way the court below found it, they were linked. She necessarily said that because she found enterprise liability, there was joint employment. So that's the issue. Arguably, that's a legal conclusion. But what are the disputed questions of fact as such? The disputed questions of fact pertain to the facts, the inferences, and the court's reliance upon the statements of the employees, which we disputed to the extent of the underlying facts on the separateness of the employment. They are alleging that at one point or another, it was all one big business unit. We have provided proof that it was not one big business unit. Are you disputing that the statements were made, or are you disputing the implications of the statements? The implications and the credibility of those statements, because we had a very clear light out for the court below that all the separateness of this, the need for the combination, the only commonality here is Lorraine Blacker, A1 medical under contract, was trying to continue the viability of alternative rehab. Now, under the cases for joint employment and for enterprise liability, Your Honor, I would suggest to you that those cases involve vertical-type operations in which growers are, you know, are in line with planters, and there is one main product at the end, which is the sale of canned goods, or like in the Bonac case. You seem to be over on the legal implications side. I'm still looking on the facts side. I don't hear any distinction. You don't dispute the accuracy of the records that are in this record. They are what they are. We do dispute the accuracy or question the accuracy of the records as to the calculations of overtime, Your Honor. We ‑‑ there is no underlying foundation for those, and it was not our intent that the court would ‑‑ we moved to summary judgment on the issue of liability only, and we did not in any way envision that this court would then turn around and impose the actual numbers, the judgment, based on the mere bare bones allegations or statement of the wage and hour investigators, their wage and hour form. We didn't believe that, that that was viable in our motion for summary judgment. First on the liability. Do your clients' affidavits controvert the affidavits of the employees in regard to specific facts, not just how you would, you know, characterize them, but specific facts, like if they say, I was told it was all one operation, and someone said, I never told them it was all one operation, you know, are there specific fact issues that you can point us to of that nature on the liability, is my first question, which is really just kind of a restatement of the question I think Judge O'Scanlan had, which I don't think you may have fully answered on liability. And then second, on damages, did your client controvert the wage investigators' numbers as to the alleged underpayment or what the overtime would be? As to your first question, yes, the affidavit of Lorraine Black, excuse me, Lorraine Black, specifically states that these operations were intended and were separate and distinct. And there are affidavit statements to the contrary from the employees that allege that, you know, she was told in a hearsay context that they were indeed one unit. And I believe it was either Ms. Yarbrough's affidavit or maybe Ms. Rapp. I cannot specifically identify which one. And it was that finding of the court where she said it was clear these were one unit because, you know, the employees envisioned it as such. Well, that's very subjective and it's taking the credibility of one employee and the allegations certainly of the secretary over and above our allegations and our statements of fact that the intent here was to maintain the separateness. As to the damages issue, because I am running out of time and I do want to address the willfulness finding in this case and also maybe reserve a minute or two for rebuttal, but as to the damages issue, we moved for summary judgment. There was not a petition here for imposition of judgment by us. No, we did not specifically disagree or raise the issue of the validity or the accuracy of it. We did submit information and statements from the Department of Labor investigators who said they could not recreate this information. They, in fact, did not know exactly how they calculated it. We did set up depositions of both Ms. Francis and Ms. Murphy who clearly stated they don't know how they got the numbers. They were from the employer's records is all they could say. They have no file here to recapitulate either their finding of joint employment and their assessment of liability. The investigators have no file on this, nor do they have any file as to how they actually calculated these overtime liability damages. They have little circles and stuff where they think this was alternative rehab and they think this was A-1, and I will note you specifically to that record excerpt because it's very, very important for the finding of willfulness that it clearly shows that in many cases there was overtime paid. These employers paid overtime when they believed individually overtime was due. The only way, and that's also in the record excerpt of Ms. Francis' or I believe Ms. Murphy's deposition, that the only way overtime liability was assessed in this case was by the collapse of the two entities. And that assessment was made over a year and a half worth of investigation where not one word was ever communicated to Ms. Black, Ms. Poorman, or anybody else that they were looking at collapsing these two entities and they knew full well that Ms. Black considered these entities to be separate and distinct. These investigators operated by nothing less than subterfuge. Well, it may not be fair, but I'm not seeing that as material to the issues, whether there's a joint enterprise or whether what the damages are, whether there's willfulness or whether there's good might relate to good faith issue. But, I mean, basically the question is, was it a joint enterprise? And if it was, that there's liability potentially. And it doesn't really matter to me. I don't think there's any law that says the investigators have to give some warning in the middle of their investigation. No, Your Honor, there's no affirmative duty on the investigator's part. But this, you know, the issue becomes one of willfulness, whether she knew or should have known. Okay? Now, this Court has relied upon its own precedent, but I consider to be a lesser standard that she should have had some appreciable cognizance that there was some problem here. Counsel, you're down to about a minute. You may want to reserve. I would, Your Honor. Thank you very much. May it please the Court. My name is Lois Zuckerman, and I represent the Secretary of Labor. The Secretary brought this action to recover unpaid overtime for eight nurses employed by both A1 Medical and Alternative Rehabilitation during the same work weeks. Counsel, the problem that I'm having is this summary judgment issue and questions of material fact. And I gather from what we hear in Ms. Pearson's presentation that there are controverted allegations which need to be resolved by a finder of fact, and obviously that would defeat summary judgment. I mean, you may very well survive after a trial, but can we really resolve this case on summary judgment? Yes, I believe that it's properly decided on summary judgment because, in fact, the District Court relied on Lorraine Black's own affidavit and deposition testimony in large part and also on the declarations of three former employees of A1 Medical and Alternative Rehabilitation. And as to those particular allegations or, rather, those particular statements in the declaration, there was no point in the proceeding that A1 Medical or Alternative Rehab actually denied or controverted any of those statements. There was no controversion? There was no opposite assertions against the employee statements? Not against the employee statements that Lorraine Black encouraged. For example, encouraged Betty Locker to work overtime for employees of A1 and Alternative, to work more hours for A1 and Alternative patients. Specifics, a few specifics, but I thought that Ms. Black controverted statements by the employees that they were told it was all one operation. I don't believe that that is the case, Your Honor. I believe that there was no question but that, and all these statements that the District Court relied on support the fact that paper formalities, the formalities of having separate companies, Alternative and A1, were maintained throughout this time. Sometimes the checks that were separately issued to the same employee for work performed for A1 clients and work performed for Alternative clients were contained in the same envelope. That seems to me a so what, because that's like a so what point, because A1 is in the process of acquiring Alternative and then it enters a contractual agreement to manage it in the interim. This seems, this kind of thing happens not with infrequency in the business world if one company is going to acquire another one and before closing the acquirer has an interest, but they may do things under contract. I don't see that that carries the day for the government. Well, in this case, the issue is whether these employees who worked for patients that were transferred back and forth and worked for clients of both companies, whether their hours should be aggregated for purposes of I understand that completely. And I guess I had the question I asked to your colleague and both of you, I must say congratulations for traveling so far for this argument. My question is, does the record show us the percentage of workers of each of these companies who had some overlap in terms of working for both companies? The record does not show that. All the record shows is the work weeks in which these eight employees worked for clients of both companies. I understand that. And I understand there's evidence on these eight employees. But let me give you an example. If each company had 500 employees and 496 of each of their employees only worked for one company and each of them had four employees who worked for both companies, so you had eight employees who had that kind of overlap, that would be a far different case for a question of whether it's one enterprise than if 50 percent of the employees are working for both companies. I could be wrong on that, but it seems to me that the companies have a valid interest, both of them, in keeping their patients happy. And if they have a legitimate business reason to move a patient from one company to the other, then it follows that they have a legitimate reason to ask the employee if they would follow the patient. And if I were the trial judge in this case, I think I would want to know the whole picture. What's the percentage of workers that are going back and forth and how frequent it is and if it only happened when they had a patient move or if it happened otherwise, you know, just to fill in. I would be concerned about those issues. Well, I think that it's important to remember that there are, that joint, that enterprise is a concept to determine whether one or more companies is covered by the protections of the Fair Labor Standards Act. And so all the analysis in the district court's decision relating to enterprise coverage was to demonstrate that there was enough related activities performed by these two companies and enough common control by Lorraine Black and A1 of these two companies and this common business purpose of the eventual merger of the two companies for their annual dollar volume of business to be aggregated so they should be considered for purposes of whether their employees are in fact covered by the Fair Labor Standards Act. And therefore, the court found coverage. However, joint employment is a completely different concept and has to go to whether one or more companies is liable for underpayments to its employees and whether one or more employees is responsible for paying the overtime. Under which the employees went from one company to another. I heard they sometimes did this to follow the patients. Did they do it for other reasons? Well, in your deposition testimony, Lorraine Black herself said that she transferred patients from alternative to a one. In order to patients. But I'm asking, did they ever transfer the nurses without transferring the patients following the patients? That is not in the record. But I would submit to the court that that is irrelevant for the purpose of determining whether these employees are entitled to overtime working one or two week days a week for patients of alternative and working the rest of the time for patients of a one. And that is the way it is that I could be wrong. But it seems to me it is relevant to whether we should treat these two companies as one enterprise. And it may be relevant to whether you treat them as joint employers for purposes of adding the hours that people work for both. Well, during this during the period that we're talking about here, this is where the violations were determined. There was one scheduler who who scheduled the nurses assignments for a one and four alternative. And and that scheduler in her declaration and statements that were not disputed by appellants, stated that she would she would assign the patients and there would not be any. She would give them a list of the give the patients a list of which nurses, whether employees of a one or alternative would be working for that patient during a particular time period. And that she actually did all the hiring and interviewing of nurses for both companies. And we believe that that is a significant fact that the district court relied on her role in staffing the companies. And all that could be true, though. And it doesn't answer the question that Judge Cuddy asked that is of interest to me also, which is when they transferred when this scheduler would schedule nurse a to move from instead of doing a one to work for alternative. Was it ever was it for we know it's sometimes for a reason that they had transferred a patient and the nurses following the patient. Was that the question, as I heard it was, was that done for other reasons as well? Did they transfer nurses for reasons other than to follow patients? And if so, what were they and how frequent? And you're telling me telling us that there was a scheduler that performed all the scheduling for both. But that could be consistent with. They they only did this when they transferred a patient. Well, the scheduler working for both of them doesn't really answer that. Well, the scheduler acted at the direction of Lorraine Black. So when Lorraine Black directed patient her to transfer a patient who had been in a patient of alternative to the to the care of a one to facilitate. Because of the fact that an anchorman wasn't able to handle her caseload for alternative medical. And so some of the patients were transferred as as Lorraine Black. The original question. This was not in the record. I think Simon was made irrespective of the patient transfers or not. I'm not. Yes. To meet the needs of the individual companies. Because alternative. Yes. Nurses were transferred from one to the other for reasons other than the patient transfer. The answer. The answer is yes. But unfortunately, the record doesn't give you the kind of numbers and that you seem to be. I heard you saying that that there was occasions when black transferred this black transferred a client from alternative to a one because because alternative couldn't provide the right service. And maybe there were cases where they transferred a client from a one to alternative because they wanted to qualify alternative for some certification by giving some experience or whatever. And in these cases where they transferred clients, it might follow that at least there's an interest in transferring the nurses or the other care attendants to stay with the client. If the if the if the medical worker wanted to do that. But that doesn't really answer the question. I don't think it answers the question. Judge Petty asked earlier, did they transfer workers from one to work from one company to another under circumstances where there wasn't also a transfer of the client? And that's a direct question. It should either be yes or no or I don't know. The record doesn't show it. And that that's that's my question. The answer is I don't know. But I don't think that also that it's that it's relevant for the purpose of determining whether these these eight nurses, when they worked during the same work week for both companies, were jointly employed by these companies who made those assignments of schedules, made those assignments of work in their own interests. And the question is, under joint employment, whether these entities were disassociated. Circumstances in health care organizations where some some person will follow a patient from one enterprise to another. So, you know, that may be, I would think, more common than this kind of situation here where we have joint management. Apparently these companies. Well, in fact, when you explore, you know, what are the circumstances by which the patient went back and forth? I would think following patients wasn't the most unusual thing in the world. Well, in fact, when these nurses, when these nurses left the employment of a one medical and followed the patients to a health care, home health care company other than alternative, they were sued by appellants. They were sued by a one rather for violating their their agreement not to compete. However, when they transferred along with the patients from from a one to alternative, they were not sued. They were, in fact, encouraged to do so. And that makes total sense. But I mean, the health care company, they may think that they would have a covenant not to compete. They don't want their they put the nurse in the home with the patient. It's their patient. They don't want the nurses they put with the patient to steal their client away, you know, and go move the client to another company. It would be normal. They would have some kind of period of time or penalty if somebody took a client. And whether that's enforceable or not under state law would depend on whether it's a reasonable restraint or under federal antitrust law and duration and scope. But it doesn't sound all that unusual. And the fact that they wouldn't write about that if there was a transfer between the company, the two companies that were in the process of merging just seems like common business sense. But I mean, can you tell tell me whether on this record we can know? And did Judge Rothstein know if we're talking about eight employees out of a thousand employees or talking about eight employees out of 12 employees total? In other words, do we know where the eight how relevant the eight employees experience is to what all the employees experience is? Well, I believe there is. I know you don't think this is relevant under your theory of the case, but at least it's bothering me as to whether the proportions of these transfers seems to me might be relevant to whether it's one joint enterprise or whether it's two enterprises with some common management under contractual arrangement and some occasional transfers. There is evidence in the record that there were about 30 full time nurses employed by a one A1 medical during this period of time. And I got half that number employed by alternative. But again, those numbers changed as the business of alternative decreased. And so if there is no specific a total of 45 between the two enterprises, I believe there is support. But I believe there is support for that statement in the record. But assuming that there is that the employees of alternative rehabilitation were covered by the Fair Labor Standards Act, then this court has a separate has has a separate issue to to turn to, which is whether the hours worked by these employees, even if there are only eight employees. We submit that if it was just one employee involved here, that because that employee acted in the interest of both a one and alternative. In being employed during that work week for the patients of both, then that employee was entitled to have all those hours worked during that work week aggregated. And if those hours were in excess of 40 hours in a work week, that employee was entitled to overtime pay for those excess hours. And I think it's important that in the context of Judge Rothstein's determination, that these violations were willful to note that not only was Lorraine Black informed as early as the summer of 1998 by Kathleen Yarbrough, that she was working since her patient had been transferred to alternative from a one. But she was working now overtime and not being paid for it because she was working for technically two separate companies. That this, in fact, was was a correct determination by the district court judge that this was a race. Some of this recovery, race judicata was raised as an affirmative defense with respect to two of the employees. And those two employees who were students, small claims court. As to those employees, there was there was no there was no evidence put forward that these claims were actually fully articulated. They were fairly were standards act overtime for the time period, the amount that they were, in fact, fully litigated. So race judicata, can't you? That is correct. But we got to apply to that problem. Excuse me, Your Honor. State law question. Well, I would I would submit, though, that in in in any case that there is no privity between these private parties and the secretary of labor. Because the secretary of labor's interests are not identical to those of the employees. The secretary of labor is recovering. He's lost overtime pay. Isn't that recovery on behalf of the employees? It is true. That's recovery on behalf of the employees. However, the secretary's interest is broader than that. The secretary also sought an injunction against further future violations of the act. And the secretary's action in bringing this case for overtime in the first place has broader implications also, because the secretary seeks to for uniform enforcement of the federal wage allowance. I don't see how race judicata would stop the secretary from bringing a claim for declaratory or injunctive relief, nor from bringing the claim for some of the damages. But why doesn't race judicata bar particular workers claims who had asserted their claims in a court action and then dismissed? We submit that because there is no privity between the secretary of labor. That doesn't mean that a court would ask for that. Indeed, the department would ask for the full amount of damages. And we wouldn't expect that that would be that would be granted because there would be no there's no obligation to pay more than the required amount of overtime. And remind me about the small claims court determination. How many employees did that involve compared to the number of employees that are at issue here? Involved two out of the six employees, two out of the six. And there was only one formal two out of the six and only one formal counterclaim filed. Although the second employee did state that she asked for overtime in open court again, but was not allowed to. So if we were to hold that race judicata bars, the claim, does that affect more than the two employees or just the two? Just the two, Your Honor. Thank you. Your time has expired. Thank you, Counsel. Ms. Pearson, you have some reserve time. Yes, Your Honor. It's very short, but I'm going to try to address the issue that seems to be probably giving a problem to the panel, which is how many employees were involved here? I'm not sure that the counsel was correct on the 3015 number. It's close to that, but then A1 has a whole crew of what they call per diem nurses that work part time on, you know, as scheduled or as requested or if they would want to take a case here and there. What does give you some insight to it is that A1 was like a $1.5 million company from a standpoint of revenues, whereas Alternative was only $200,000. There was a very, very small force, small group of employees at Alternative. And, in fact, these eight are almost it from a standpoint of the end run on Alternative as to who were indeed Alternative employees. It's also important to note that these Alternative employees were given the chance to work at A1, offered the work at A1, because there wasn't much work at Alternative. Alternative was fledgling, and they were saying, okay, you want more work, you get more work. I will note to you, and it's finally come to my attention as I was preparing for this argument, it always helps when you go back to the source, and in the regulation on joint employment, there is a footnote that specifically says that joint employment is not intended to extend to circumstances where an employee seeks additional work from another employer. It's footnote number two. And, fortunately, it just, in our academic discussions about enterprise and joint employment and what it all means, it escaped me until I was preparing for this argument. But it is there, and it is the intent there. Also, to address the race judicata claims, Your Honor, and I still have time. I got 46 here. I'm not sure, but they maybe gave me too much. Forty-six too much. I've raised this issue with our clerk of court any number of times, but apparently there is no manufacturer in the country that lets you have zero. As soon as you've reached the end of your argument, it should say zero from my point of view, but it keeps counting. As you can see now, it's down to zero. Actually, it seems like it's going up, because I was having 42 seconds. I was watching it, and I was talking fast to make sure I got enough. When the light's on red, what's happening is the number is increasing. All right. Thank you, Your Honor. Thank you very much, Counsel. The case just argued will be submitted for a decision.
judges: Cudahy , O'scannlain, Gould